1  TRACY L. WILKISON
   Acting United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   TIMOTHY J. SEARIGHT (SBN 151387)
4  Assistant United States Attorney
        1200 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone:  (213) 894-3749
        Facsimile:  (213) 894-0142
7       E-mail:  Timothy.Searight@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA
9
                      UNITED STATES DISTRICT COURT
10
                 FOR THE CENTRAL DISTRICT OF CALIFORNIA
11
   UNITED STATES OF AMERICA,        CR 03-0084-VAP
12
             Plaintiff,
13                                   GOVERNMENT'S OPPOSITION TO
                  v.                 DEFENDANT'S APPLICATION FOR
14                                   COMPASSIONATE RELEASE;
    GEORGE WILLIAMS,                 MEMORANADUM OF POINTS AND
15                                   AUTHORITIES IN OPPOSITION.
             Defendant.
16

17          The government, by and through an attorney of record,

18  Assistant United States Attorney Timothy J. Searight, hereby files

19  opposition to defendant George Williams's motion for compassionate

20  release.  The government's opposition is based on the attached

21  memorandum of points and authorities and the files and records of

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    this case, some of which are being contemporaneously filed in an

2    excerpt of record.

3
                                        Respectfully submitted,
4
                                        TRACY L. WILKISON
5                                       Acting United States Attorney

6                                       SCOTT M. GARRINGER
                                        Assistant United States Attorney
7                                       Chief, Criminal Division

8
      Dated:   June 22, 2021
9                                              /s/
                                        TIMOTHY J. SEARIGHT
10                                      Assistant United States Attorney

11                                      Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        2

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.**

3

**STATEMENT OF FACTS**

4      On July 8, 2004, defendant was arrested and arraigned on a First

5   Superseding Indictment.  (CR 488.)  Defendant was named only in Count

6   One of the indictment.  Count One charged defendant, and several

7   others, with conspiracy to manufacture, possess with intent to

8   distribute, and distribute phencyclidine ("PCP"), in violation of

9   Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

10  (Id.)

11      On July 7, 2005, the government filed an information alleging

12  that defendant had previously been convicted of two felony drug

13  crimes.  (CR 928.)  Specifically, the government alleged that, on May

14  14, 1985, defendant was convicted of possession of PCP for sale, in

15  violation of California Health and Safety ("H&S") Code Section

16  11378.5, and that on October 24, 2000 defendant was convicted of

17  manufacturing PCP in violation of California H&S Section 11379.6.

18  (ER 4-5.)[1]

19      **A.    Trial Proceedings**

20      On July 12, 2005, defendant proceeded to jury trial with co-

21  defendants, including Reed.  (CR 954.)

22

23      [1]  "ER" refers to the government Excerpt of Record filed
    concurrently with this document, and is followed by the page number.
24  The Pre-Sentence Report ("PSR") is referenced extensively in this
    document and can be found at page 16 of the ER.  The government has
25  not filed the PSR underseal because it was previously filed by
    defendant on the record in defendant's direct appeal.  The PSR
26  citations are followed by the paragraph number within the PSR.  "RT"
    refers to the Reporter's Transcript of Proceedings that were
27  previously filed with the Court and is followed by the date of the
    transcript and the page number.

28                                      1

1

2          At trial, agents and officers from a Los Angeles task force

3    testified that in the fall of 2002, they began investigating PCP

4    manufacturing and distribution activities of Reed and his associates.

5    (RT 7/15/05 125.)  On March 21, 2003, in an isolated area near

6    Adelanto, California, agents located a PCP manufacturing site,

7    recovered four pounds of PCP, and chemicals and equipment used in the

8    manufacture of PCP.  (RT 7/15/05 28, 32-34, 93-97.)  Based in part on

9    the facts of the Adelanto seizure, agents then obtained a series of

10   orders to conduct wiretap interception of telephones being used by

11   Reed and his associates.  They began intercepting telephones on April

12   4, 2003, and continued through early June 2003.  (RT 7/15/05 107-13.)

13   The wiretap intercepts led to the stop of a van traveling on

14   interstate 15 north of San Bernardino that contained 26.1 kilograms

15   of PCP in crystalline form, and found chemicals and equipment capable

16   of producing approximately 175 kilograms of PCP.  (RT 7/22/05 51-61,

17   103-05.)  A few weeks after the seizure on Interstate 15, in May

18   2003, intercepted calls led to the seizure of five gallons of liquid

19   PCP and the remnants of PCP manufacturing operation at a property in

20   Palmdale, California.  (RT 7/22/05 7-13).

21         From Reed's telephones, defendant was intercepted.  The calls

22   suggested that defendant was a distributor of quantities of PCP made

23   by Reed, and that he advised Reed on eluding law enforcement.

24   Shortly after the Interstate 15 seizure, defendant was intercepted

25   discussing whether an informant's information or law enforcement

26   surveillance had resulted in the seizure.  Defendant advised Reed to

27   be wary of surveillance at locations where chemicals could be picked-

28                                    2

1   up. (RT 7/21/05 50-55; PSR ¶ 83.)  At trial, a co-defendant, Kim

2   Stinson, who had previously pled guilty, testified for the

3   government.  Stinson testified that he had also been a part of Reed's

4   PCP distribution group.  (RT 7/19/05 57-59.)  There was a wiretap

5   intercept call played for the jury in which defendant told Stinson

6   that defendant had out-of-State customers who wished to purchase PCP.

7   (PSR ¶ 69.)  Stinson testified that he personally delivered gallon or

8   half-gallon quantities of PCP from Reed to defendant on a few

9   occasions.  (Id.)  He testified that he recalled one incident in

10   which he watched Reed pour a gallon of PCP into an apple juice

11   container and gave it to defendant.  (Id.)  After the seizure of the

12   PCP in Palmdale, and the remnants of PCP manufacturing, defendant and

13   Reed discussed law enforcement surveillance, and defendant expressed

14   concern that he would be arrested.  (PSR ¶ 103.)

15     In the course of trial, defendant moved to dismiss the

16   indictment and charges against based on a witness' failure to

17   preserve handwritten notes.  (CR 978.)  The motion was denied.  (CR

18   981.)

19     At the conclusion of the government's case, defendant and co-

20   defendants moved to dismiss the case, arguing insufficiency of the

21   evidence.  (CR 984.)  The motion was denied.  (Id.)

22     On July 28, 2005, defendant was convicted on the conspiracy

23   charge in Count One of the indictment.  The jury made a specific

24   finding that the amount of PCP for which defendant was criminally

25   responsible as a part of the conspiracy was 175 kilograms. (RT

26   7/28/05 10-15; PSR ¶ 109.)

27     ///

28                         3

1          **B.     Defendant's Criminal History**

2          In preparation for sentencing, a Pre-Sentence Report was

3    prepared.  Defendant was born on February 29, 1964.

4          On May 4, 1985, when defendant was 21-years-old, defendant was

5    convicted of violations of California Health and Safety ("H&S") Code

6    Sections 11351 (possession of cocaine for sale) and 11378.5

7    (possession for sale of PCP).  (PSR ¶ 130.)  The PSR stated that

8    officers searched defendant's bedroom and recovered "16 grams of

9    cocaine in various packages and 34.7 grams of liquid PCP."  (PSR

10   ¶ 131.)  Defendant was sentenced to 3 years in prison.  He was

11   paroled in October 1986, and discharged from parole in October 1987.

12   (Id.)

13         On April 6, 1991, defendant was convicted of voluntary

14   manslaughter, a violation of California Penal Code Section 192A.

15   (PSR ¶ 132.)  The killing occurred on March 7, 1990, when defendant

16   was 26-years-old.  (Id.)  The PSR has summarized the facts as

17   follows:

18              Williams "crept" toward the victim from the rear of a
             car where the victim was sitting, and fired five shots at
19           him.  The victim died at the scene after being struck in
             the head, abdomen, torso and left arm.

20

21   (PSR ¶ 133.) Defendant was sentenced to six years in prison.  (PSR

22   ¶ 132.)  Defendant first paroled in September 1993, when he was 29-

23   years-old.  On April 12, 1995, defendant was convicted of misdemeanor

24   driving with .08 or greater blood alcohol level.  (PSR ¶ 134.) On

25   September 14, 1995, defendant was found inside a vehicle with both a

26   loaded .45 caliber and loaded 9 mm handguns in the car.  (PSR ¶ 149.)

27   Likely as a result of one or both of these matters, defendant's

28                                  4

1  parole was violated and he was returned to prison on September 27,

2  1995.  (PSR ¶¶ 132, 134.)  Defendant paroled from prison a second

3  time in 1996, and was discharged from parole in October 1997, when he

4  was 32-years-old.  (PSR 132.)

5       On February 2, 2000, defendant was arrested for manufacturing

6  PCP, a violation of California H&S Code § 11379.6.  (PSR ¶ 135.)  The

7  PSR states that officers searched the residence of an associate and

8  found chemicals used to manufacture PCP.  (PSR ¶ 136.)  The resident

9  said defendant stored the chemicals there.  Officers then searched

10  defendant's residence and his bedroom within the residence.  (Id.)

11  The PSR states,

12          Deputies searched the master bedroom and found, among
            other things, a Glock 9mm semiautomatic along with four
13          loaded clips, a package of 150 sandwich bags, and a triple
            beam scale, which was inside the closet.  Chemicals used to
14          manufacture PCP were also found in the garage.

15  (Id.)  As a result of the seizure, defendant was convicted of PCP

16  manufacture on October 24, 2000, when defendant was 36-years-old.

17  Defendant received a sentence of 365 days in county jail with seven

18  years in State prison suspended, and a three-year period of

19  probation.  (PSR ¶ 135.)

20       As stated above, the facts of this federal case involving PCP

21  manufacture and distribution arose in 2002 and the first part of

22  2003, when defendant was in his late 30s, and when he was on State

23  probation for PCP manufacturing.  (PSR ¶ 138.)

24  ///

25  ///

26  ///

27  ///

28                                    5

1          **C.     Mandatory Minimum, PSR Calculations, and the Sentencing**
2                 **Hearing**

3          After trial and previous to the sentencing hearing, defendant

4    admitted the two allegations of prior felony drug convictions

5    pursuant to 21 U.S.C. §§ 851 and 841(b)(1)(A).  (CR 1133.)  With the

6    offense of conviction, this resulted in a mandatory minimum sentence

7    of life in prison.  (PSR ¶ 173.)

8          The PSR stated that, given the drug quantity of 175 kilograms of

9    PCP for which defendant was found criminally response, the Sentencing

10   Guidelines base offense level was 38.  (PSR ¶ 114.)  The PSR did not

11   suggest any adjustments for role in the offense or for acceptance of

12   responsibility.  (PSR ¶¶ 112, 116, 117.)  The PSR stated that two

13   Criminal History points were added based on the fact that defendant

14   was on probation for PCP manufacturing at the time of the instant

15   offense involving PCP manufacturing and distribution.  (PSR ¶¶ 135,

16   138.) Based on defendant's prior convictions and criminal history,

17   the PSR calculated his Criminal History Category as IV.  (PSR ¶ 140.)

18   However, under Guidelines Section 4B1.1, defendant was determined to

19   be a "career offender."  This was based on defendant's prior

20   conviction for voluntary manslaughter in 1992 and his conviction for

21   manufacturing PCP from 2000.  (PSR ¶¶ 124, 125.)  This raised

22   defendant's Criminal History category to VI.  The corresponding

23   Guidelines sentencing range (apart from the mandatory minimum) was

24   360 months to life in prison.  (PSR ¶¶ 172, 173.)

25         In defendant's sentencing position he argued that a mandatory

26   life sentence was "arbitrary and excessive, in violation of the

27   Eighth Amendment to the United States Constitution."  (CR 1191.)

28                                        6

1   Defendant argued that a minor role should be applied, but made no

2   mention of defendant's career offender status.  (Id.)  Defendant

3   argued for a sentence of 240 months in prison.  (Id.)

4        In the government's sentencing position, the government went

5   through in detail how a decision was made to pursue a life in prison

6   sentence for defendant.  (CR 1170; ER 67.)  The government stated

7   that it had conducted "proffer" sessions with more than ten co-

8   defendants in the case and inquired as to who in the group was "the

9   most dangerous, violent and sophisticated."  (Id.)  The government

10  stated, "In addition to co-defendant Rodrick Reed, many of the

11  persons interviewed identified defendant as possessing those

12  characteristics to an unusual degree."  The government also discussed

13  defendant with Detective Labbe of the Los Angeles County Sheriff's

14  Department and Detective Lowes with the San Bernardino County

15  Sheriff's Department.  The Detectives knew defendant for many years.

16  The government stated that the Detectives believed defendant "was

17  both highly dangerous and sophisticated."  (ER 67-68.)  The

18  government stated that it examined defendant's criminal history, and

19  the facts of his conviction for voluntary manslaughter in which he

20  "crept" up and killed a person, and that defendant was twice arrested

21  in possession of firearms.  (RT 68.)  On the facts of conviction, the

22  government argued that defendant acted as a mentor to Reed and that

23  he was sophisticated in PCP activities and in attempting to elude law

24  enforcement detection.  (Id.)  The sentencing position concluded,

25  "The government believes that the decision to pursue the life

26  sentence was appropriate given the facts of the case and defendant's

27  background."  (ER 69.)

28                                    7

1    The sentencing hearing was conducted on January 17, 2006.  (CR

2  1193.)  The Court stated the mandatory minimum in the case and that,

3  pursuant to the Guidelines, defendant was a career offender.  (ER

4  73.)  In January 2006, the Court imposed sentence in light of the

5  Supreme Court's decision in Booker v. Washington, 543 U.S. 220

6  (2005).  Accordingly, the Guidelines were viewed as advisory in

7  nature, and the Court framed its comments within the factors of 18

8  U.S.C. § 3553(a).  (ER 74.)  The Court stated, "[I]t's a rare crime

9  that, of course, should merit a life sentence.  However, that is what

10  is mandated by the law here and it appears to the Court that it is

11  merited." (ER 77.)  Evaluating the § 3553(a) factors, and as to the

12  nature and circumstances of the offense, the Court noted that it was

13  "a widespread and very dangerous and serious conspiracy."  (Id.)  The

14  Court stated, "I include Mr. Williams as one of those higher up and

15  more responsible and certainly Mr. Reed."  (ER 75.)  As to

16  defendant's role in the offense, the Court stated, "And I think the

17  Government is correct that Mr. Reed viewed him as a mentor and turned

18  to him for advice."  (ER 76.)  As to deterrence, the Court said that

19  it did not know what would deter defendant and stated, "I think it

20  was a murder conviction after which the defendant still has firearms,

21  is still found in possession of firearms after his release from

22  prison after that."  (ER 77.)  The Court said, "There are previous

23  convictions, previous drug convictions, which was not deterrence, and

24  the time served on that was not deterrence to getting involved in

25  ///

26  ///

27

28                                  8

1  this conspiracy." (Id.)  The Court also expressed its view of the

2  § 3553(a) factors in relation to the mandatory minimum:

3          It's not necessary to go through the 3553(a) factors
       probably in light of the fact that there's a mandatory
4       minimum, but in light of the graveness or the gravity, I
       suppose, I do so in the alternative to rely on the
5       mandatory minimum.

6  (ER 12.)  The Court sentenced defendant to life in prison.  Defendant

7  has been in prison in this case since July 8, 2004.  (CR 488.)

8          **D.    Prison Conduct**

9          Defendant is currently in custody at the United States Prison in

10  Victorville, California.  Prison records indicate that, in 2009 he

11  was found to have "unused balloons" in his locker.  (ER 87.)  In 2012

12  he was disciplined for fighting with another inmate.  (Id.)  In 2014

13  he was found to have alcohol in his cell.  (Id.)

14          Defendant is currently 57-years-old.

15                              **II.**

16                            **ARGUMENT**

17          The First Step Act does not apply retroactively to allow

18  elimination of mandatory minimum sentences that were imposed prior to

19  the adoption of the First Step Act.  It is uncontested that, when

20  defendant was sentenced in 2006, in conjunction with the crime of

21  conviction, the two alleged and admitted prior drug convictions

22  created a mandatory minimum sentence of life in prison.  That

23  mandatory minimum sentence remains today notwithstanding the changes

24  brought by the First Step Act.

25          On the merits, apart from the mandatory minimum, this Court

26  indicated in 2006 that it believed a life sentence was appropriate

27  for defendant.  In addition, both the First Step Act and the 18

28                              9

1   U.S.C. § 3553(a) factor require a court to examine, when considering

2   re-sentencing the danger to the community that would be posed by a

3   defendant's release or shortened sentence.  In this case, defendant

4   was convicted of voluntary manslaughter when he "crept" up on the

5   victim and shot him five times in the head and torso.  Although the

6   killing occurred when defendant was in his mid-20s, shortly after

7   being released from prison he was found with a loaded Glock handgun

8   with multiple magazines in his bedroom and PCP manufacturing

9   equipment in his garage.  After being released from prison still

10  later, he sold large quantities of PCP with co-defendant Reed and

11  counseled him on how to avoid law enforcement surveillance.  In

12  prison, defendant has been disciplined for fighting with an inmate

13  and possession of alcohol.  There is nothing to suggest that the

14  Court's decision in 2006 was in error, or any clear evidence that

15  defendant has reformed.

16       Defendant previously argued that his trial counsel was

17  ineffective in a 28 U.S.C. § 2255 motion that was denied by this

18  Court.  Competence of counsel issues are not relevant to a motion for

19  compassionate release.

20       Defendant's motion should be denied.

21

22  **A.    The First Step Act Does Not Apply Retroactively To Amend
        Previously Imposed Mandatory Minimum Sentences**

23       The First Step Act does not apply to defendant.  Defendant was

24  sentenced, and his sentence became final, long before the adoption of

25  the FSA.  While it is certainly true that mandatory minimums have

26  been changed in drug cases by the FSA, and if sentenced today on the

27  same facts a lower mandatory minimum would apply, there is nothing in

28                                      10

1   the FSA indicating that the new mandatory minimums are to be given

2   retroactive effect, or have no effect, in pre-FSA cases.  The FSA

3   applies retroactively to pre-enactment offenses only "if a sentence

4   for the offense ha[d] not been imposed" as of the date of the Act's

5   enactment, December 21, 2018.  First Step Act of 2018, Pub. L. 115-

6   391, 132 Stat. 5222, § 403(b).

7        Accordingly, in United States v. Voris, 964 F.3d 864 (9th Cir.

8   2020), the Ninth Circuit held that the First Step Act did not apply

9   where the Act's alteration to the mandatory-minimum stacking

10  provision of 18 U.S.C. § 924(c) would have reduced his mandatory

11  sentence from 110 years to 50 years.  Id. at 868, 873.  See also,

12  United States v. Tomes, --- F.3d ---, 2021 WL 868555 (6th Cir.

13  2021)(shorter mandatory minimum of 15 years in drug case not

14  retroactive to defendant sentenced before adoption of FSA).

15       More broadly, granting defendant's request would dismantle the

16  mandatory sentencing scheme Congress enacted in 18 U.S.C. § 841(b)(1)

17  and in place today but with different minimums or, perhaps, have the

18  practical effect of eliminating mandatory minimums.  Defendant's

19  approach would potentially permit sentencing courts to impose

20  mandatory minimums, as dictated by Congress, and then, after the

21  judgment became final, eliminate mandatory sentences by simply

22  declaring "extraordinary and compelling" circumstances.  Although the

23  Ninth Circuit has not decided whether "'the imposition of a mandatory

24  minimum sentence . . . deprive[s] the court of the authority to later

25  grant compassionate relief,'" a court has suggested that such

26  authority may be unavailable.  United States v. Arrona, No. 17-CR-

27  142-JFW, Docket No. 163 at 4-5 n.3 (C.D. Cal. Jun. 26, 2020) (quoting

28                                    11

1   United States v. Varnado, No. 14-CR-283-LAB, 2020 WL 2512204, at *1

2   n.1 (S.D. Cal. May 15, 2020)).

3       Apart from the potential consequences of defendant's suggestion

4   going forward, the FSA cannot be interpreted to permit the

5   retroactive elimination of mandatory minimums in pre-FSA cases such

6   as defendant's.

7

8       **B.    Defendant Has Not Shown He Is Entitled to Relief Under the First Step Act**

9       As a result of the First Step Act ("FSA"), 18 U.S.C.

10  § 3582(c)(1)(A) states that "the court . . . upon motion of the

11  defendant . . . may reduce the term of imprisonment . . . after

12  considering the factors in section 3553(a) to the extent they are

13  applicable, if it finds that extraordinary and compelling reasons

14  warrant such a reduction."  At a later point, the section states that

15  the reduction be "consistent with applicable policy statements issued

16  by the Sentencing Commission."

17      The FSA, at 28 U.S.C. §§ 994(a) and 994(t), directed the

18  Sentencing Commission to promulgate and adopt policy statements

19  defining the meaning of "extraordinary and compelling reasons" for

20  reduction.  As noted by the Ninth Circuit in United States v. Aruda,

21  993 F.3d 797 (2021), the Sentencing Commission has not yet adopted

22  such a policy statement.[2]  Section 994(t), however, states,

23  _____

24  [2]    Prior to the FSA, in Guidelines § 1B1.13, the Commission has
    defined what circumstances are "extraordinary and compelling" for
    purposes of compassionate release.  Specifically, application note 1
25  of this Guideline provides an exhaustive list of "extraordinary and
    compelling" reasons for release: (1) a debilitating or terminal
26  medical condition; (2) a serious deterioration in health due to
    aging; (3) responsibility as the sole remaining caregiver to a minor
27

28                                    12

1    "Rehabilitation of the defendant alone shall not be considered an

2    extraordinary and compelling reason."  The defendant seeking release

3    under § 3581(c)(1) bears the burden to establish the statutory

4    requirements.  See United States v. Ortiz, No. 18-CR-2063-BAS, 2020

5    WL 5500229, at *1 (S.D. Cal. Sept. 11, 2020); United States v.

6    Rogers, No. 16-CR-72-DAD, 2020 WL 5440352, at *3 (E.D. Cal. Sept. 10,

7    2020); United States v. McGrue, No. 08-CR-1318-ODW-1, 2020 WL

8    4042777, at *1 (C.D. Cal. Jul. 10, 2020.

9        A defendant's motion must satisfy three requirements.  First,

10   the defendant has to establish "extraordinary and compelling reasons"

11   for his release.  18 U.S.C. § 3582(c)(1)(A)(i).  Second, the

12   defendant must establish that he "is not a danger to the safety of

13   any other person or to the community."  18 U.S.C. § 3582(c)(1)(A);

14   see also United States v. Clews, 2020 WL 3529870 (June 30,

15   2020)(affirming denial of compassionate release motion because the

16   district court reasonably concluded that the defendant was a danger

17   to the community); United States v. Arceneaux, (same).  And, third,

18   the defendant has to establish that his release would be consistent

19   with "the factors set forth in section 3553(a)."  18 U.S.C.

20   § 3582(c)(1)(A); see also United States v. Thrift, 834 F. App'x 411

21   (affirming denial of relief because the district court reasonably

22   concluded that compassionate release would be inconsistent with the

23   § 3553(a) factors); United States v. Mortensen, 2020 WL 2549970

24   (same).  Only if the defendant satisfies all three requirements can

25

26   child, spouse, or partner; and (4) other reasons as determined by the
     BOP.[2]  U.S.S.G. § 1B1.13, cmt. n.1(A)–(D).
27

28                                    13

1   he obtain relief.   What defendant argues is that his sentencing today

2   would not have been the same as it was in 2005, that his attorney

3   should have negotiated a better outcome for him, that his sentence is

4   more than other defendants in the case, and that he has

5   rehabilitated.[3]

6       As to defendant's argument that, as a result of the FSA, his

7   sentence would be different today than it was in 2005, it is unclear

8   that is the case.   This Court indicated that it believed a life

9   sentence was appropriate even apart from the mandatory minimum.   The

10  Court stated, "[I]t's a rare crime that, of course, should merit a

11  life sentence.   However, that is what is mandated by the law here and

12  it appears to the Court that it is merited." (ER 77.)   Certainly the

13  Court, and the government, were aware that the sentence would endure

14  through the years and would be a primary marker in defendant's life.

15      The government's reasons for opposing something different than a

16  life sentence are not different today than they were in 2005.

17  Whether viewed under the "danger to the safety of the community"

18  language of § 3582(c) or as a § 3553(a) factor, the government's

19  primary concerns are for defendant's recidivism and violence.   While

20  in his mid-20s, defendant committed an execution-style killing.   He

21  came up behind a person and shot the person five times in the head

22  and torso.   After serving a lengthy prison sentence, defendant's

23  parole was violated, and post-prison, he was found with a gun, and

24  returned to prison.   That is, after serving this lengthy term in

25  _____

    [3]   Although of no relevance to this motion, the FSA added
26  serious violent felony" prior convictions to § 841(b)(1) as crimes
    which may be used to enhancement drug convictions.   Possibly,
27  defendant's prior voluntary manslaughter would be the type of crime
    that could now be used as a prior enhancement.

28                                      14

1  prison he had a loaded Glock handgun, four clips and packaging

2  materials in his bedroom and PCP chemicals in his garage.  (PSR

3  ¶ 135-36.)  Perhaps most importantly, after all of this, and being

4  released from prison again, defendant chose to associate with co-

5  defendant Rodrick Reed in this case, who was himself engaged in

6  large volume PCP manufacturing and kept high-powered guns and firearm

7  silencers.  What defendant seems to have learned from his multiple

8  convictions and prison experiences was to try to avoid law

9  enforcement detection while still committing crimes, and to pass that

10  knowledge and experience on to others.  The government is certainly

11  sensitive to the fact that defendant's voluntary manslaughter

12  conviction occurred many years ago, when defendant was in his 20s,

13  but what defendant chose to do again and again after that conviction

14  -- and after being released to society -- is the strongest indicator

15  of danger to the community.  Defendant's crimes did not end with the

16  voluntary manslaughter conviction.  He continued, on into his

17  thirties, with unfortunate associates and the same dangerous, and

18  callous, behavior.  There are insufficient facts to say with

19  resolution that things have changed.

20      In support of "extraordinary and compelling" reasons for

21  release, defendant does not argue failing health or circumstances

22  beyond those attendant to serving the prison sentence.  Defendant

23  argues that he has undergone a "dramatic rehabilitation" and that his

24  "steadfast commitment to self-improvement during his years of

25  incarceration is remarkable and weighs in favor of reducing his

26  sentence to time-served."  (Def. Mot., pp. 13, 20.)  In prison,

27  defendant relates that he has made efforts to remain a presence in

28                                 15

1  the life of his family and children, that he has completed vocational

2  programs and maintained employment in the UNICOR unit, and furthered

3  his formal education.  (Def. Mot., pp. 13-15, 20-22.)  He has

4  presented to the Court the outlines of a re-entry plan.  (Def. Mot.,

5  pp. 24-25.)

6       The government does not have any way of independently examining

7  defendant's commitment to his family.  His prison records, however,

8  indicate that he has been disciplined for fighting with an inmate,

9  and for having alcohol in his cell.  Within the confines of a prison,

10 these facts are not dissimilar from what defendant manifested in the

11 past.  They do not suggest steadfast adherence to the law.

12      Defendant argues that, apart from Reed, he received the longest

13 sentence than "nearly all" of the co-defendants in the case.  (Def.

14 Mot., p. 23.)  While that is certainly correct, the exception is the

15 life-sentence imposed for co-defendant Reed, and defendant's own

16 exceptionally serious criminal history and recidivism.  At

17 sentencing, this Court specifically noted defendant's criminal

18 history in comparing him to co-defendants and stated, "I think the

19 Government is correct that Mr. Reed viewed [defendant] as a mentor

20 and turned to him for advice."  (ER 76.)  The Court viewed defendant

21 "as one of those higher up in the conspiracy."  (ER 75.)  The

22 sentence was different from others because defendant's background and

23 crimes were more serious.

24      Defendant dedicates a considerable portion of his brief to an

25 argument that he should be granted compassionate release and a

26 reduced sentence because, he says, his trial counsel was ineffective.

27 (Def. Mot., pp. 1, 3-4, 10-12.)  Defendant has attached declarations

28                                16

1  with regard to the performance and background of trial counsel.

2  Nowhere in his brief, however, has defendant cited any authority that

3  ineffective assistance of counsel at trial and sentencing is a basis

4  for granting compassionate release.  Defendant previously filed a 28

5  U.S.C. § 2255 motion challenging the efficacy of his counsel on

6  several bases. (CR 1581.)  The government's response included a

7  declaration from trial counsel in which counsel stated, "I spoke with

8  defendant about the possibility of accepting a plea agreement in

9  which he would receive a sentence of less than life in prison.  I had

10 discussions with defendant about the facts and circumstances in the

11 case, possible defenses, and the potential sentence in the case.

12 Defendant elected to proceed to trial."  (CR 1601, p. 27.)  Defendant

13 filed a lengthy reply document to the government's § 2255 opposition

14 continuing to challenge the competence of counsel.  (CR 1604.)  In

15 the end, this Court denied defendant's motion.  (CR 1648.)  At trial,

16 counsel did file a motion to dismiss the indictment.  (CR 978.)

17 After presentation of the government's case, counsel moved to dismiss

18 the charge on the basis of insufficiency of the evidence.  These

19 motions were also denied. (CR 981, 984.)

20     The words "compassionate release" and "extraordinary and

21 compelling" are not legal terms into which unbounded arguments may be

22 poured.  The issue of competence of counsel has no relevance to this

23 motion.

24                              **III.**

25                           **CONCLUSION**

26     Defendant's motion for re-sentencing and compassionate release

27 should be denied.

28                               17